Opinion issued May 10, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00887-CR

———————————

Gobin Ramroop a/k/a Govinda Vishnu, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 56th District Court

Galveston County, Texas



Trial Court Case No. 09CR3741

 



 

MEMORANDUM OPINION

          A
jury convicted appellant Gobin Ramroop,
also known as Govinda Vishnu, of stalking.  See Act of Jan. 28, 1997, 75th Leg., R.S., ch. 1,
§ 1, sec. 42.072, 1997 Tex. Gen. Laws 1, 1 (amended 1999, 2001, 2011) (current version
at Tex. Penal Code Ann. § 42.072 (West Supp. 2011)).  He pleaded “true” to a prior conviction for
attempted murder, and the jury sentenced him to 14 years in prison and assessed
a $2,500 fine.  On appeal, Ramroop
argues, first, that the evidence was insufficient to conclude that he knew or
reasonably believed that the complainant would regard his conduct as
threatening bodily injury or death and, second, that the trial court erred by admitting
evidence of his prior attempted-murder conviction.  We affirm.

Background

          Valerie
Immore, the complainant, owned a yoga studio in Friendswood.  Ramroop, a native of India, first contacted
Immore by phone at her studio.  He claimed
to be the CEO of a non-profit company called Gitanjali
International, and he offered to become an instructor at Immore’s studio and
expand her own studies in transcendental meditation.  Immore agreed to hear what he had to say, and,
following further written correspondence, he arrived at her studio.  She regarded the purpose of the meeting as determining
whether they wanted to do business together. 
During their conversation, Immore mentioned that she was married.  Ramroop replied, “That chapter of your life is
ending.  A new one will begin.”

As their initial conversation drew
to a close, Ramroop asked if he could pray mantras, or Hindu prayers, over
her.  Immore agreed, lay flat on the
floor, and fell into “a nice meditative state” as Ramroop chanted Sanskrit words
and invoked the Hindu gods.  After some
time, Ramroop asked if he could touch her “sacral chakra,” the area around the
navel, and Immore consented.  Ramroop
blessed Immore’s womb as he pressed her naval area for approximately ten
minutes.  As he did so, Ramroop prayed
that the gods implant a seed in Immore and said that he felt the heartbeat of his
unborn child.  These words made Immore
“freak out,” but she did not let her unease show, and she permitted Ramroop to
continue.  He continued chanting the
mantras, passed his hand onto her right breast at one point, and finished by
kissing her hands and feet.

Although Immore felt uneasy after
the initial encounter, she did not regard Ramroop as having made a sexual
advance and hoped that he would become a spiritual teacher at her studio.  She sent a letter to Ramroop to make clear
that she was interested only in a spiritual relationship to enhance her
meditation and to nurture her growth as an individual and teacher.  Immore stated in that letter that Ramroop was
the sweetest and purest man she had ever known. 
She further stated,

I never want to be the cause of any of your
pain for you have endured to[o] much already. 
It would hurt me deeply to break your heart.  I feel like you are looking for me for a very
deep connected relationship, one that is intellectual, spiritual and romantic.  That all sounds so
beautiful to me but I do not want a romantic relationship.  I do not want to have another baby.  I do not want to have my guru rolled into one
with my mate.

Ramroop likewise wrote a letter to Immore, which was
apparently sent before he received Immore’s, in which he recounted his praying
of the mantras over her.  In the letter,
Ramroop wrote:

The way I touched you is such a personal and
intimate way.  No one is allowed to touch
you in such a manner. . . . When we were talking I said to you, “I
would like to have the love and intimacy of a woman.”  I said, “I would like to have a child.”  I do not know what it’s like to be a father.
. . . The seed of a divine child was placed in your womb on Saturday
19th Jan 2008. . . . You have heard the heart beat of your next
child.  The baby is already in your
womb.  That child is going to be a
boy.  In order to have a heart beat, there has to be a body.  Your baby has a body of Shuddha
Satiwa (absolute purity).  You and I, would be the
child’s biological parents.

The letter continued:

I love you with all my heart,
and I’ll never disrespect you or hurt you. 
As a matter of fact if you did not love me or feel safe with me you
would not have allowed me to touch you. 
I did not feel any sensations or desires.  I have a job to do.  This is a sacred science.  The body is sacred.  You are precious and priceless.  You are the most beautiful person in my life.

The letter closed with a Sanskrit mantra wishing
peace.

          During
the next few weeks, Immore continued receiving phone calls from Ramroop.  She usually kept the calls brief, which
apparently aggravated Ramroop.  Another
point of contention was his level of anticipated involvement with the
studio.  During those exchanges, Ramroop
told Immore in an “angry” tone and “with a lot of force in his voice” that he
would not accept the authority of any woman or American.  After one class, Immore’s mother overheard Ramroop
tell students that yoga is taught incorrectly in America and that he wanted to
change that.  Immore confronted Ramroop about
his criticisms and told him not to say such things to her students.

          After
Immore received several more letters from Ramroop that she considered hate
mail, Immore consulted a friend, who was a former police officer, about how to
handle the situation.  On his advice, she
wrote Ramroop a “cease and desist” letter informing him that she wanted to be
left alone and that she did not want to have any business venture or
apprenticeship of any kind with him.  In
that letter, she stated:

We have nothing further to resolve.  Any further contact you make by phone, letter
or in person will be considered harassment and will be reported to the proper
authorities.  If you should try to hurt
my business, as you stated in a phone message on February 19th, I will make all
of your letters available to those authorities, and anyone else who would have
my best interests in mind, to substantiate my fear that you are not safe for me
to be around.  Please move on and leave
me alone and all whom you have met as a result of me alone as well.

Ramroop
responded with a letter stating “any Legal registered Mail or First Class Mail
sent to you, does not constitute Harassment.”  Many of his communications to Immore
reflected assertions that he was not harassing her.  Ramroop also sent gifts to Immore, including
artwork, a birthday card, an Indian sari, perfume, photographs of himself, and
photographs of Immore taken during her previous career as a model.  In some of the photographs, Immore’s clothing
was altered.

Sometime after Immore had written
the “cease and desist” letter, Immore’s friend, the former police officer,
discovered that Ramroop had been convicted of attempted murder in another
state, and he passed that information to her. 
Upon learning of the prior conviction, Immore felt afraid that Ramroop
would try to hurt or kill her or someone in her family.  She reported Ramroop’s behavior to the Friendswood Police
Department.  One officer left Ramroop phone
messages informing him of Immore’s complaint, inviting him to give his side of
the story, and instructing him to not have any more contact with her.  Another officer told Ramroop not to contact
Immore and repeated that instruction by certified letter.

Immore applied for a family violence protective order against
Ramroop.  See Tex. Fam.
Code Ann. § 81.001 (West 2008).  The application alleged that Ramroop believed
he was her “spiritual mate” and that he was destined to be with her.  It further alleged that Ramroop had committed
acts that were reasonably intended to result in physical harm, bodily injury,
assault, or sexual assault or were threats that reasonably placed Immore and
her family in fear of imminent physical harm, bodily injury, and sexual
assault.  Both Immore and Ramroop
appeared at the hearing.  The court
denied the application for the protective order because the circumstances did
not implicate “family violence.”  See id. § 71.004 (defining “family
violence” as hostile acts by “a member of a family or household against another
member of the family or household”).

After the protective order was denied, Ramroop was convicted
of harassing Immore in a proceeding separate from the present case and
sentenced to 180 days’ confinement.[1]  After his release, Ramroop continued to send
letters to Immore and also began sending her hundreds of email messages.  He wrote in one letter that Immore would
share his shame for the rest of her natural life.  In an email message expressing similar
sentiments, he wrote:

When the Human Heart, is Evil: Wicked: Hateful: 

Spiteful: Criminal: with Malicious Intent.  It does not know how to express, Human Love:
Neither;

Does it know how to Accept Human Love.  It knows only one thing.  It can only Hate!

What you and your mother did to me, is a classic
example of the most potent hate a woman can express.  You and your mother hurt me.  You have no idea how sad I feel.

You are claiming to be a yoga teacher: Yoga teachers
don’t do these things.  The very first
day I met you, I thought I met an Angel.  Today I realize, that
I was wrong.

You have not made any attempt to tell me that you are
sorry neither have you said that you made a mistake or you never thought, it would turn out this way.

If there is a Living God I swear, all those who hurt
me; I will make their life a Living Hell, (7) days a week, (24) a day for the
rest of their Natural Life!

I have the right to self defence.  I am not hurting anyone.  But others are hurting me.

I never did anything to hurt you.

Neither, will I ever do anything to hurt you.

Immore
wrote back, “Do NOT threaten me or my family! . . . You continued to
threaten my business and insisted on doing all the things you did.”  She also wrote in that same message, “You and
I do not need to continue to carry bad or hurt feelings in our hearts towards
one another.  I do not hold any bad
thoughts or feelings towards you, I merely send you
light and peace.”

In a subsequent email message, Ramroop told Immore, “I am
deathless.  I am immortal.  I am imperishable.”  He also stated in that same message, “I care
about you: And I care for you: I will never hurt you.”  In a later email message, Ramroop wrote:

I don’t want to live anymore.  I don’t have a life.  My heart is shattered into a million
pieces.  My heart is bleeding.  It states, in the Hindu astrological charts; according
to my karma: A woman will be the cause for my death.  This is the Law of destiny.  This is the Law of Karma. This is the mystery
of the Laws of karma: What ever [sic] is destined to happen in your life: It will happen at the right
time; at the right moment in life.  Not
before: Not after.

          I have said these words
to you so many times.  You can not [sic] live
the life of a double Agent.  I have in my
possession, an official letter from the Court, with a signature, and the State
Seal of Texas proclaiming You and I are Husband and
Wife.  You and I both agree There are no accidents in the Universe.

. . . This is a small, but significant example, of the power
of HATE.  You are one, of the many women
who hate men.

. . . .

          We must suffer a great
deal of pain, shame, and disgrace; We are treated like
a criminal; like a murder; like a rapist; Like a child molester: The most
heinous crime any person, can be convicted of, Molesting a child or rapeing [sic] a
person.

          On the Internet blog
sites and there are many; these are the things women are saying about me.  They are telling other women, to look out for
me.  They are telling all women yoga teachers, that I am a predator.

. . . .

          I am suffering more than
any person, because of the Internet.  It
is spreading like wild.  My situation has
nothing to do with yoga. It has to do with Valerie Immore, owner of Sundance
Yoga Studio, must be clearly well understood . . . .

          I said to you: The Laws
of karma will take it’s [sic] own course; and when that day come.  I will be there to comfort you this is my
final response. . . . I was sleeping on a cold concrete floor when
you are taking a shower. There is a video camera on you, when you are using the
rest room. There is a video camera on you. 
Sleeping on a steel bed, I can not imagine
what I have ever done to you to deserve this.

. . . .

          This is true testimony
of Greatness, Saintlyness [sic], Purity, Beauty and Perfection.  I Govinda Vishnu, wants [sic]
the entire world to know no matter what you and your mother have done to me.

          I Love you with all my
Heart.  You are truly my Beloved.  You are my Sweetheart.  Do you remember the lady in Texas, who killed
her five children for a man.  Today; Texas is withnessing
[sic] another tragedy,
that is touching the lives of six billion people.  The Television Cameras and the News Paper
Reporters are waiting for your story.

Ramroop
sent Immore dozens of other letters and hundreds of other email messages,
including many that were sent after he was indicted for stalking in this case.  One letter was sent to her home.  He also made calls to her mobile phone at
times during the day and night.

Although most of Ramroop’s messages were ignored, Immore and
her personal assistants, who had access to her office email, occasionally
responded.  For instance, after receiving
an email message from Ramroop during the holiday season, Immore replied, “God
bless you this Christmas.  Please have
peace in your heart . . . .”  At trial, Immore explained that she had written
that because she lacked police protection and “there’s no sense in me doing
something that would be negative and would provoke a negative reaction.”

Less than two months before trial, Ramroop
came to Immore’s studio during business hours and left two pieces of artwork. 
When Immore learned of his visit, she became visibly upset and the
incident was reported to police.

Analysis

I.              
Sufficiency of the evidence

In his first issue, Ramroop argues that the evidence was
legally insufficient to support the judgment because no rational trier of fact
could have found beyond a reasonable doubt that Ramroop knew or reasonably
believed that his conduct would cause Immore to fear bodily injury or death.  See
Act of Jan. 28, 1997, 75th Leg., R.S., ch. 1, § 1, sec. 42.072(a)(1),
1997 Tex. Gen. Laws 1, 1 (current version at Tex. Penal
Code Ann. § 42.072(a)(1)).  He argues, “[W]hile
it is true that Appellant may have or reasonably should have known that his
contact was a nuisance to Immore at times, there is no evidence to show
Appellant had reason to believe Immore regarded his contact as a physical
threat to her.”  Ramroop points out that
Immore sometimes responded to his communications with compassion and without
expressing fear.

The State argues that the jury could have reasonably inferred
Ramroop’s knowledge or reasonable belief that Immore feared him from the
threatening nature of his correspondence, the fact that he repeatedly wrote that
he would never hurt her, the fact that the police had become involved, the fact
that Immore had applied for a protective order, and his prior conviction for
harassing her.

In reviewing the sufficiency of the evidence to support a
criminal conviction, a court of appeals will determine “whether, after viewing
the evidence in the light most favorable to the prosecution, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.”  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)
(emphasis in original).  As the
exclusive judge of the facts, the jury may believe or disbelieve all or any
part of a witness’s testimony.  Chambers v. State, 805
S.W.2d 459, 461 (Tex. Crim. App. 1991).  We presume that the fact finder resolved any
conflicting inferences in favor of the verdict, and we defer to that resolution
if it is supported by the evidence in the record.  See
Jackson, 443 U.S. at 326, 99 S. Ct. at 2793.  On appeal we may not re-evaluate the weight
and credibility of the evidence and thereby substitute our own judgment for
that of the fact finder.  Williams v. State, 235
S.W.3d 742, 750 (Tex. Crim. App. 2007).  In reviewing the evidence, circumstantial
evidence is as probative as direct evidence in establishing the guilt of an
actor, and circumstantial evidence alone can be sufficient to establish guilt.  Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

During the time that operative facts occurred, the Penal Code
defined the offense of stalking, in relevant part, as follows:

(a) A person commits an offense if the person, on more than one
occasion and pursuant to the same scheme or course of conduct that is directed
specifically at another person, knowingly engages in conduct, including
following the other person, that:

(1) the actor knows or
reasonably believes the other person will regard as threatening:

(A) bodily injury or death
for the other person;

(B) bodily injury or death for
a member of the other person’s family or household; or

(C) that an offense will be
committed against the other person’s property;

(2) causes the other person or a member of the other
person’s family or household to be placed in fear of bodily injury or death or
fear that an offense will be committed against the other person’s property; and

(3) would cause a reasonable
person to fear:

(A) bodily injury or death
for himself or herself;

(B) bodily injury or death
for a member of the person’s family or household; or

(C) that an offense will be
committed against the person’s property.

See Act of Jan.
28, 1997, 75th Leg., R.S., ch. 1, § 1,
sec. 42.072(a), 1997 Tex. Gen. Laws 1, 1
(current version at Tex. Penal Code Ann. § 42.072(a)).  Ramroop’s legal
sufficiency challenge goes only to the evidence to establish subsection (a)(1)
of the statute: whether he knew or reasonably believed that Immore would regard
his conduct as threatening bodily injury or death against her or her family.

Within a month of their first encounter, Immore sent Ramroop
a “cease and desist” letter in which she told him that she would consider any
further contact by him to be harassment and that she would report it to
authorities.  She also expressed in that
letter her “fear that you are not safe for me to be around.”  On multiple occasions, the police contacted
Ramroop on Immore’s behalf to tell him to leave her alone.  Immore’s application for a protective order
alleged that Ramroop had made threats that placed her and her family in fear of
imminent physical harm, bodily injury, and sexual assault.  Ramroop attended the hearing on that
application for a protective order.  He
was convicted in a separate, prior proceeding of harassing Immrore.  He often wrote to Immore that he would never
hurt her, which suggests his awareness that she feared that he would hurt her.  In one email message, Ramroop asserted that
Immore and her mother had hurt him and that he would make the lives of “all
those who hurt me . . . a Living Hell.”  Immore wrote back, “Do NOT threaten me or my
family!”  Despite Immore’s wish to be
left alone as communicated by herself and others,
Ramroop continued to contact her by letter, email, and telephone.  He also visited her studio after having been
indicted in the present case.

The jury could reasonably infer beyond a reasonable doubt from
the foregoing evidence—the hostile nature of many of Ramroop’s
messages, Immore’s expressions to him that she felt threatened, instructions communicated
by police that he not contact her, and the multiple legal proceedings against
him, including the present one—that Ramroop knew or reasonably believed that Immore would regard his
conduct as threatening bodily injury or death to her or her family.  See
Ploeger v. State, 189 S.W.3d 799, 809–10 (Tex. App.—Houston [1st Dist.] 2006,
no pet.) (holding that evidence was sufficient that
stalker knew or reasonably believed that his victim feared him when victim physically
manifested her fear and others instructed the stalker to leave her alone); Clements v. State, 19 S.W.3d 442, 448–49
(Tex. App.—Houston [1st Dist.] 2000, no pet.) (same,
when victim asked her stalker to stop harassing her, stalker acknowledged his
victim’s fear in prior proceeding, and stalker knew that police officer had
accompanied victim when moving out of their shared apartment).  Accordingly, the evidence was sufficient on this
element of the offense.  See Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.

We overrule Ramroop’s first issue.

II.           
Evidence of prior conviction

In his second issue, Ramroop argues that the trial court
erred by admitting into evidence, during the guilt-innocence phase of the trial,
Immore’s testimony concerning Ramroop’s prior conviction for attempted murder
because its prejudicial effect outweighed its probative value.[2]  See Tex. R. Evid.
403.  The State argues that the attempted
murder conviction was probative of Immore’s and Ramroop’s states of mind, both
of which are implicated by the elements of the offense, and that any possible
prejudice was minimized by the trial court’s limiting instruction to the jury.

We review a trial court’s decision to admit or exclude
evidence under an abuse-of-discretion standard.  Casey v. State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).  A trial court abuses its discretion when its
decision lies outside the zone of reasonable disagreement.  Id.  Under Texas Rule of Evidence 403, evidence, although
relevant, “may be excluded if its probative value is substantially outweighed
by the danger of unfair prejudice, confusion of the issues, or misleading the
jury, or by considerations of undue delay, or needless presentation of
cumulative evidence.”  Tex. R. Evid.
403.  In Gigliobiano v. State, 210 S.W.3d 637 (Tex. Crim. App. 2006), the Court of
Criminal Appeals stated:

[A] trial court, when undertaking a Rule 403 analysis, must balance
(1) the inherent probative force of the proffered item of evidence along
with (2) the proponent’s need for that evidence against (3) any
tendency of the evidence to suggest decision on an improper basis, (4) any
tendency of the evidence to confuse or distract the jury from the main issues,
(5) any tendency of the evidence to be given undue weight by a jury that
has not been equipped to evaluate the probative force of the evidence, and
(6) the likelihood that presentation of the evidence will consume an
inordinate amount of time or merely repeat evidence already admitted.

Gigliobianco, 210 S.W.3d at 641–42. Ramroop examines each of the six Rule
403 factors explained in Gigliobiano
and argues that the first five of the six factors weighed against admitting the
evidence.

During the
guilt-innocence phase of trial, Immore was examined outside the jury’s presence
to determine whether she could testify about her knowledge of Ramroop’s
criminal history.  Immore testified that
after she had sent the “cease and desist” letter her friend, a former police
officer, provided her with Ramroop’s conviction history of attempted murder and
other offenses.  She testified that this
information caused her fear to “escalate to a whole different place” and that
she “was afraid that he might do the same thing to me that he’d been in prison
for, that he might try to hurt me, kill me, try to hurt my husband, try to hurt
my children.”

At the close of her
testimony, the State argued that evidence of the attempted murder conviction
should be admitted because it went to the existence and reasonableness of
Immore’s fear.  Ramroop argued that the evidence
was inadmissible because there was no similarity between his prior attempted
murder conviction and his conduct, there was no evidence that Ramroop was aware
that Immore knew about his prior conviction, and the prejudicial effect of the
evidence outweighed its probative value. 
After these arguments, the court stated:

I think that the testimony is
relevant.  No doubt the testimony is also
prejudicial as we reference your 403 argument.  However, because the testimony goes directly
to one of the elements in this particular charge, the Court finds that the
probative value outweighs the prejudicial value.

The court stated that it would provide
an instruction to limit the jury’s consideration of Ramroop’s attempted murder
conviction to its relationship with Immore’s state of mind.  The State and Ramroop then stipulated that
the jury would hear that Ramroop had been convicted of attempted murder.  When the jury returned to the courtroom,
defense counsel announced in open court, without waiving his objection,
that Ramroop had pleaded guilty to and was convicted of attempted murder
in another state.  Immore then testified about
having found out about the conviction and that it made her afraid that Ramroop
would hurt her or someone in her family. 
When the jury retired for deliberations, the trial court gave a limiting
instruction regarding the testimony about other offenses, and Ramroop’s counsel
stated that he had no objection to the jury charge.  On appeal, Ramroop does not challenge the language
used in the limiting instruction.

          The
offense of stalking requires proof that the victim was placed in fear that she
or her family would be harmed or killed and that her fear was reasonable.  See
Act of Jan. 28, 1997, 75th Leg., R.S., ch. 1,
§ 1, sec. 42.072(a)(2)–(3), 1997 Tex.
Gen. Laws 1, 1 (current
version at Tex. Penal Code Ann. § 42.072(a)(2)–(3)).  Immore’s testimony that she knew about
Ramroop’s prior conviction for attempted murder was probative of both the
existence and reasonableness of her fear. 
This goes to the first factor explained in Gigliobianco of “the
inherent probative force of the proffered item.”  See Gigliobianco, 210 S.W.3d at 641.  Moreover, the State needed to elicit her
testimony concerning the basis for her fear because much of Ramroop’s conduct
was not overtly hostile or threatening. 
The State’s need in this regard goes to the second factor of “the proponent’s need for that
evidence.”  See id. 
Thus, two of the Rule 403 factors explained in Gigliobianco favored admitting Immore’s testimony concerning Ramroop’s prior conviction.

          The
third, fourth, and fifth factors explained in Gigliobianco disfavor admitting
evidence that has any tendency to suggest an improper decision, confuse or
distract the jury from the main issues, or be given undue weight by a jury that
has not been equipped to
evaluate the probative force of the evidence. 
See id.  The trial court
apparently took account of these factors by acknowledging that the evidence of Ramroop’s
prior conviction was “prejudicial.” 
However, the court mitigated that prejudicial effect by giving a
limiting instruction to which Ramroop did not object.  This instruction limited the jury’s
consideration to the purpose for which Immore’s testimony was admitted, that
is, to prove her and Ramroop’s states of mind. 
See Abdnor
v. State, 871 S.W.2d 726, 738 (Tex. Crim. App.
1994).  Such instructions are intended to
lessen the inherent prejudicial effect of learning about extraneous
offenses.  See Robinson v. State, 701 S.W.2d 895, 899
(Tex. Crim. App. 1985).  On appeal, we
presume that the jury followed the trial court’s instructions.  Thrift v. State, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).  Although this presumption is rebuttable, the
appellant has the burden to rebut it by pointing to evidence that the jury
failed to follow the trial court’s instructions.  Id.  Ramroop has not attempted to rebut the
presumption.  In light of the probative
value of the challenged testimony, the State’s need for the testimony, and the
trial court’s unchallenged limiting instruction to lessen the prejudicial
effect, we hold that the trial court’s ruling on the admissibility of testimony
concerning Ramroop’s prior attempted murder conviction did not constitute an
abuse of discretion.  See Casey, 215 S.W.3d at 879.

          We overrule Ramroop’s second issue.

Conclusion

          We
affirm the judgment of the trial court.

 

 

 

                                                                      Michael
Massengale

                                                                      Justice


 

Panel consists of Justices Jennings, Massengale, and
Huddle.

Do not publish. 
 Tex. R. App. P. 47.2(b).











[1]         This
court affirmed that prior conviction on appeal. 
See Ramroop v. State, No. 01-09-00256-CR, 2010 WL 670563 (Tex.
App.—Houston [1st Dist.] Feb. 25, 2010, pet. ref’d) (mem.
op., not designated for publication).





[2]
        In
this section of his appellate brief, Ramroop repeatedly references one of the
State’s exhibits: a penitentiary packet reflecting the out-of-state convictions
for attempted murder and other offenses. 
However, this exhibit was not admitted until the punishment phase of trial.  Nonetheless, we conclude that Ramroop really means to challenge Immore’s
testimony concerning his attempted murder conviction.  In the interest of justice, we will address
this argument.  See Tex. R.
App. P. 38.9 (providing that “substantial
compliance” with briefing rules is “sufficient” to “acquaint the court with the
issues in a case”).